**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| ZAHRA ARABZADA, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 23-655 (RC) |
| | : | | |
| v. | : | Re Document No.: | 8 |
| | : | | |
| ANTONIO DONIS, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

**Granting Defendants' Motion to Dismiss**

## I.  INTRODUCTION

Plaintiff Zahra Arabzada sues Antonio Donis in his official capacity as the Director of the

Arlington Asylum Office of the United States Citizenship and Immigration Services ("USCIS"),

Ur Jaddou in her official capacity as Director of USCIS, Ted Kim in his official capacity as the

Associate Director of the Refugee, Asylum and International Operations Directorate, Alejandro

Mayorkas in his official capacity as Secretary of the Department of Homeland Security, and

Christopher A. Wray in his official capacity as Director of the Federal Bureau of Investigation

(collectively, "Defendants" or "the Government").  Arabzada seeks relief under the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 555, 706, and the Mandamus Act, 28 U.S.C.

§ 1361, based on allegations that the Government has unreasonably delayed the adjudication of

her I-589 asylum application.  The Government moves to dismiss part of Arabzada's case for

lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and moves to

dismiss the rest of Arabzada's case for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6).  For the reasons explained below, the Court grants Defendants' motion to

dismiss.

## II. BACKGROUND

### 1. Statutory Background

The Immigration and Nationality Act ("INA") permits individuals to apply for asylum in the United States if they have a "well-founded fear of persecution" in their home country because of their "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1158(b)(1)(B)(i), 1101(a)(42). "Any alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." *Id.* § 1158(a)(1). As relevant here, the INA mandates that "in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed . . . [and] final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed." *Id.* § 1158(d)(5)(A)(ii)-(iii).

### 2. Factual and Procedural Background

Arabzada is a citizen of Afghanistan. *See* Compl. ¶ 8, ECF No. 1. In December 2020, Plaintiff filed an I-589 asylum application with USCIS. *Id.* ¶ 16. Arabzada "completed the required biometrics processing," but to date has not been scheduled for an asylum interview. *Id.* ¶¶ 16–17. After waiting over two years for an interview on her application, Arabzada filed this action, alleging that the Government violated the INA by not processing her I-589 petition in a timely manner. *See generally id.* ¶¶ 23–26. In support of her claim, Arabzada alleges that she suffers from post-traumatic stress disorder, *id.* ¶ 19, and that "the delay by Defendants has caused severe exacerbation of [her] trauma and has prohibited her from receiving the benefits that are available to asylees and refugees in the United States," *id.* ¶ 35.

Before the Court is Defendants' motion to dismiss, Defs.' Mot. Dismiss ("Mot."), ECF

No. 8. Arabzada has filed a brief in opposition, Pl.'s Mem. of Law in Opp'n of Defs.' Mot.

Dismiss ("Opp'n"), ECF No. 12, and Defendants have filed a reply in support of their motion,

Defs.' Reply, ECF No. 14. Defendants' motion to dismiss is now ripe for review.

### III.  LEGAL STANDARDS

#### A.  Rule 12(b)(1)

To survive a Rule 12(b)(1) motion to dismiss, Arabzada bears the burden of establishing

the Court's subject matter jurisdiction. *See M.M.V. v. Barr*, 456 F. Supp. 3d 193, 209 (D.D.C.

2020). "Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's

claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is

acting within the scope of its jurisdictional authority." *See Grand Lodge of Fraternal Ord. of

Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). When evaluating a motion to dismiss

under Rule 12(b)(1), the Court must treat the complaint's factual allegations as true. *See

Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015). But the Court need

not accept inferences drawn by a plaintiff if those inferences are unsupported by facts alleged in

the complaint, nor must the Court accept a plaintiff's legal conclusions. *Food & Water Watch,

Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

One component of the Court's Article III subject matter jurisdiction is standing to sue.

*See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (explaining that standing "is an essential

and unchanging part of the case-or-controversy requirement of Article III"); *see Fla. Audubon

Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) ("[A] showing of standing is an essential and

unchanging predicate to any exercise of [a federal court's] jurisdiction." (quotation marks

omitted)). To establish Article III standing, a party must: (1) allege that he or she "suffered an

3

injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) allege "a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court"; and (3) demonstrate that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (cleaned up). A "deficiency on any one of the three prongs suffices to defeat standing." *US Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000); *see Am. Freedom Def. Initiative v. Lynch*, 217 F. Supp. 3d 100, 104 (D.D.C. 2016). In short, if a plaintiff lacks standing the Court must dismiss for lack of jurisdiction.

### B.  Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To that end, a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations and footnote omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.

"In determining whether a complaint fails to state a claim, the [c]ourt may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *Palakuru v. Renaud*, 521 F. Supp. 3d 46, 49 (D.D.C. 2021) (cleaned up).  A court may take judicial notice of information posted on official public websites of government agencies. *Devani v. U.S. Citizenship & Immigr. Servs.*, No. 22-cv-1932, 2023 WL 2913645, at *3 n.1 (D.D.C. Apr. 12, 2023).

### IV.  ANALYSIS

#### A.  Standing

As a threshold jurisdictional matter, the Court addresses the parties' dispute respecting whether FBI Director Christopher Wray should be dismissed as a defendant.  The Government contends that Arabzada lacks standing to sue Director Wray.  *See* Mot. at 10.  The Court agrees.

As explained above, to establish standing, a plaintiff must allege "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560.  In other words, the plaintiff's injury must be "trace[able] to the challenged action of the defendant." *Id.*  And "plaintiffs must establish causation separately for each defendant." *Coubaly v. Cargill, Inc.*, 610 F. Supp. 3d 173, 180 (D.D.C. 2022); *Garcia v. Stewart*, 531 F. Supp. 3d 194, 205 (D.D.C. 2021) ("[B]ecause standing is not dispensed in gross, a plaintiff must demonstrate standing for each claim he seeks to press against each defendant . . . ." (cleaned up)); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (stating that a "plaintiff must demonstrate standing for each claim [s]he seeks to press"); *Fla. Audubon Soc.*, 94 F.3d at 664 ("Causation may . . . be said to focus on whether a particular party is appropriate . . . .").

Here, Arabzada alleges (if inferences from the complaint are made in her favor) that the unreasonable delay in processing her application is fairly traceable to the FBI because, when an

applicant submits her I-589 petition and is entered into the Refugee Asylum and Parole System, an automatic check of the FBI's name database is initiated as to that applicant. *See* Compl. ¶¶ 13, 22; Opp'n at 1–2. Arabzada's complaint, however, does not allege (1) that this automatic check process has not occurred for her petition, (2) that this "automatic check" is being delayed, or (3) that any delay is "fairly traceable" to the FBI or Director Wray. *See generally* Compl. Indeed, there are no allegations whatsoever that this step in the visa application process has contributed in any manner to the delay in Arabzada's petition. Accordingly, Arabzada has failed to trace any harm that she has suffered to the conduct of the FBI or Director Wray. Because Arabzada has alleged no facts tracing her injury to Director Wray, the Court concludes that Arabzada lacks standing to sue Director Wray and dismisses Director Wray as a defendant in this case. *See Logan v. Blinken*, No. 21-cv-2275, 2022 WL 3715798, at *3 (D.D.C. Aug. 29, 2022) (dismissing claim against Director Wray when plaintiff "failed to allege any plausible role" he played in processing plaintiff's visa application); *see Fla. Audubon Soc.*, 94 F.3d at 663–64. It appears from Arabzada's complaint, however, that the other defendants in this case still have some part to play in adjudicating her application, and therefore, Arabzada has standing to sue those defendants.

### B. APA & Mandamus Claims

The Court turns to Arabzada's claims against the remaining Defendants. Arabzada argues that she is entitled to relief under both the Mandamus Act, 28 U.S.C. § 1361, and the APA, 5 U.S.C. §§ 555(b), 706(1), for Defendants' alleged unreasonable delay in processing her I-589 asylum application. *See* Compl. ¶¶ 23–37.

1. Clear and Non-Discretionary Duty

To warrant judicial review of an agency's unreasonable delay under either the APA or the Mandamus Act, a plaintiff must allege that an agency has a clear non-discretionary duty to take a specific action and that the agency failed to take that action. *See Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 340 (D.C. Cir. 2023) ("To state a claim for unreasonable delay [under the APA], Plaintiffs must first allege that the agency failed to take a discrete agency action that it is required to take . . . ." (citation omitted)); *Babamuradova v. Blinken*, 633 F. Supp. 3d 1, 19 (D.D.C. 2022) ("What plaintiffs must show to establish a mandamus claim is similar to what they must show . . . under the APA, as in both instances plaintiffs must establish that the government has a clear, nondiscretionary duty."); 5 U.S.C. § 706(1) (empowering federal courts to "compel agency action unlawfully withheld or unreasonably delayed"); *see also* 5 U.S.C. § 701(a)(2) (exempting "agency action . . . committed to agency discretion" from judicial review under the APA).

Thus, the APA "allows courts to provide relief for [an agency's] failure to act," but only when an agency has failed to take a discrete action which the agency was required to take. *Babamuradova*, 633 F. Supp. 3d at 14 (emphasis omitted). Similarly, mandamus jurisdiction is only present where "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)).

Arabzada contends that Defendants' duty to act on her visa application "is not discretionary but is, by definition, a mandatory duty." *See* Compl. ¶¶ 4, 15, 20, 26. Arabzada argues that the INA and associated regulations impose a "duty to adjudicate the Plaintiff's I-589" application that "is not within the Defendants' discretion." *Id.* ¶ 26 (citing 8 U.S.C. § 1158

(d)(5)(A)(ii)-(iii)).  Defendants disagree, arguing that the timeline set by the INA is

discretionary.  *See* Mot. at 11–13.

The Court agrees with Arabzada that 8 U.S.C. § 1158 (d)(5)(A)(ii)-(iii) imposes a non-

discretionary duty.  Although the ultimate decision *whether* to grant asylum relief is

"discretionary," *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 724 (D.C. Cir. 2022), the INA

mandates that "in the absence of exceptional circumstances, the initial interview or hearing on

the asylum application *shall* commence not later than 45 days after the date an application is

filed" and "final administrative adjudication of the asylum application, not including

administrative appeal, *shall* be completed within 180 days," 8 U.S.C. § 1158 (d)(5)(A)(iii)

(emphases added).

As the D.C. Circuit has explained, the term "shall is mandatory."  *Anglers Conservation*

*Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016) (emphasis omitted) (explaining that

"[o]rdinarily, legislation using 'shall' indicates a mandatory duty").  The section of the INA that

Arabzada cites here uses the term "may" for some provisions but uses the word "shall" for the

specific requirement that, "absen[t] exceptional circumstances . . . final administrative

adjudication of the asylum application" be completed within a certain time period.  8 U.S.C.

§ 1158 (d)(5)(A)(ii)-(iii).  "[W]hen a statutory provision uses both 'shall' and 'may,' it is a fair

inference that the writers intended" the word "shall" to impose a mandatory duty.  *Anglers*, 809

F.3d at 671.  The Court can therefore infer that the word "shall" in this provision of the INA

creates a mandatory and non-discretionary duty.  And because "a precise section of the INA . . .

imposes a mandatory duty," Arabzada may seek to enforce that duty under the APA.

*Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203, 235 (D.D.C. 2021) (cleaned up) (citing

*Meina Xie v. Kerry*, 780 F.3d 405, 406 (D.C. Cir. 2015) and *Anglers Conservation Network*, 809

F.3d at 671); *see also Dawod v. Garland*, 2023 WL 8605320, at *5 (C.D. Cal. Aug. 10, 2023) ("[A]djudication of the asylum application . . . is not discretionary given the INA's use of the word 'shall.'" (citing 8 U.S.C. § 1158(d)(5)(A)(ii))).

Moreover, even if the INA did not provide a mandatory and nondiscretionary duty, courts in this district have also concluded that § 555(b) of the "APA imposes a general but nondiscretionary duty upon an administrative agency" and "creates a duty for the Government to reach a final decision on [immigration] applications 'within a reasonable period.'" *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the U.S. v. Kerry*, 168 F. Supp. 3d 268, 282, 293 (D.D.C. 2016) (quoting *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 103 F. Supp. 3d 113, 118–19 (D.D.C. 2015)).  Even where an agency's statutory mandate does not impose a specific, non-discretionary duty, the "general" duty of the APA is sufficient grounds for judicial review of an agency action, "authoriz[ing] a reviewing court to 'compel agency action unlawfully withheld or unreasonably delayed.'"  *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003) (quoting 5 U.S.C. § 706(1)).  Hence, the APA, which directs reviewing courts to grant relief when agency action is "unreasonably delayed," 5 U.S.C. § 706(1), authorizes judicial review of the Government's failure to adjudicate Arabzada's petition.

Here, Arabzada identifies both the specific asylum provision of the INA and the more general unreasonable delay provision of the APA to demonstrate that Defendants had a non-discretionary duty.  *See* Compl. ¶ 37.  Accordingly, the Court holds that Arabzada has identified

a clear non-discretionary duty and next addresses whether the Government's conduct constitutes unreasonable delay.[1]

## 2.  Unreasonable Delay

The APA authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  Here, the Court finds that Arabzada has failed to state a claim for relief because the duration she has waited for adjudication of her asylum visa application is not unreasonable under this Circuit's precedents.

There is no bright-line guidance to dictate when an agency's adjudication timeline crosses into unreasonableness.  *See In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004).  "Resolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court." *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100.  Courts in this Circuit, however, have adopted the following six factors as a guide to determine whether an agency's delay is "unreasonable":

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take

---

[1] Because the APA provides an "adequate remedy," mandamus relief is not available here.  *See Fornaro*, 416 F.3d at 69 (quoting *Power*, 292 F.3d at 784); *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) (explaining that the threshold mandamus requirements are jurisdictional).  The fact that mandamus is not available here, however, is ultimately immaterial because "the governing standards under § 706(1) of the APA and the Mandamus Act are essentially the same."  *Agua Caliente Band of Cahuilla Indians v. Mnuchin*, No. 20-cv-01136, 2020 WL 2331774, at *4 (D.D.C. May 11, 2020) (internal quotation marks omitted) (citing *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 659 n.6 (D.C. Cir. 2010); *see also Ramirez v. Blinken*, 594 F. Supp. 3d 76, 90 (D.D.C. 2022) ("The standards for challenging agency inaction under the APA and the Mandamus Act are the same.").

into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.D.C. 1999) (internal quotation marks omitted) (citing *Telecomms. Rsch. and Action Ctr. v. F.C.C.* ("*TRAC*"), 750 F.2d 70, 80 (D.D.C. 1984)); s*ee also Da Costa*, 80 F.4th at 340 (applying *TRAC* factors to "guide . . . unreasonable-delay analysis" in immigration case); *Punt v. U.S. Citizenship & Immigr. Servs.*, No. 22-cv-1218 (RC), 2023 WL 157320, at *3 (D.D.C. Jan. 11, 2023) ("If the record contains enough facts to evaluate the *TRAC* factors, courts apply the *TRAC* factors at the motion to dismiss phase of cases involving claims of unreasonable delay." (internal quotation marks omitted)).

When applying *TRAC*'s guidance, no single factor is dispositive—however, the first and fourth factors generally carry the most weight.  *See Da Costa*, 80 F.4th at 339; *In re Core Communications, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) ("The first and most important factor is that the time agencies take to make decisions must be governed by a 'rule of reason'" (internal quotation marks omitted) (quoting *TRAC*, 750 F.2d at 80)); *Zaman v. U.S. Dep't of Homeland Sec.*, No. 19-cv-3592, 2021 WL 5356284 at *7 (D.D.C. Nov. 16, 2021) ("The fourth factor . . . carries the greatest weight in many cases." (internal quotation marks omitted)).

### a.  First Factor

The first *TRAC* factor favors Defendants.[2]  This factor requires the Court to "inquir[e] into whether there is any rhyme or reason for the Government's delay."  *Palakuru*, 521 F. Supp. 3d at 50–51 (internal quotation marks omitted).  "[T]he Court must determine 'whether the

---

[2] Although the "first two factors are often considered together," *Ahmadi v. Scharpf*, No. 23-cv-953, 2024 WL 551542, at *5 (D.D.C. Feb. 12, 2024), in this action, it is analytically cleaner to analyze them separately.

agency's response time complies with an existing specified schedule and whether it is governed by an identifiable rationale.'" *Devani*, 2023 WL 2913645, at *3 (quoting *Ctr. for Sci. in the Pub. Int. v. FDA*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014)).

The government argues that the delay in adjudicating Arabzada's I-589 asylum petition is attributable to a rule of reason. *See* Mot. at 15–16. Specifically, USCIS has explained that it implemented a "Last-In-First-Out" ("LIFO") policy, *see id.* at 5, 15–16, which it predicted would help decrease the backlog of pending asylum applications, *see* 2020 USCIS Ombudsman Ann. Rep. 43, fig. 4.3, https://www.dhs.gov/sites/default/files/publications/20_0630_cisomb-2020-annual-report-to-congress.pdf (last visited February 14, 2024). USCIS employs this policy to "deter individuals from using asylum backlogs solely to obtain employment authorization by filing frivolous, fraudulent or otherwise non-meritorious asylum applications." USCIS, Affirmative Asylum Interview Scheduling, https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/affirmative-asylum-interview-scheduling (last visited Mar. 18, 2024). "Giving priority to recent filings allows USCIS to promptly place such individuals into removal proceedings, which reduces the incentive to file for asylum solely to obtain employment authorization." *Id.* USCIS concluded that the LIFO approach would help it "to decide qualified applications in a more efficient manner." *Id.* Thus, Defendants say, the asylum visa adjudication process follows a "rule of reason" and the first *TRAC* factor supports the Government's conduct. *See* Mot. at 15–16.

Arabzada counters that the "LIFO [policy] is not reducing the number of backlogged cases." Opp'n at 5. She contends that the backlog of pending cases in the Arlington Field Office increased by roughly 21% between March 31, 2022 and September 30, 2022, and that the national asylum application backlog also grew roughly 11% from December 2022 to March 31,

2023.  *Id.*; Reply at 6 (Government repeating these numbers without disputing their accuracy).[3]
Arabzada argues that "[w]ith the consistently increasing backlog of cases, USCIS may never get
to the back of the line."  Opp'n at 5.

While Arabzada may question the efficacy of the Government's method of efficiently
adjudicating asylum applications, the factual question does not control the Court's analysis when
the first factor merely requires the Court to identify whether Defendants have given a "rhyme or
reason" for the delay.  *See Ctr. for Sci.*, 74 F. Supp. 3d at 300; *Da Costa*, 80 F.4th at 342
(explaining that the "length of the wait alone is not sufficient to show that USCIS does not
follow a rule of reason" and "[c]onsidering [the obstacles faced by the government] together with
the competing demands on the agency, [the court] cannot say as a matter of law that the
processing time itself establishes that USCIS lacks a rule of reason").  "In general, courts in this
jurisdiction have regularly found that the Government applies a 'rule of reason' to the review of
visa petitions by adjudicating applications in the order they were filed."  *Mottahedan v. Oudkirk*,
No. 23-cv-3486, 2024 WL 124750, at *4 (D.D.C. Jan. 11, 2024).  LIFO flips the chronological
order in which the Government adjudicates applications, but it is ultimately similar as an orderly
chronological approach with a clearly identifiable rationale.  Many courts in other jurisdictions
have agreed that LIFO constitutes a rule of reason.  *See, e.g.*, *Varol v. Radel*, 420 F. Supp. 3d
1089, 1097 (S.D. Cal. 2019) (determining that the LIFO policy followed a rule of reason); *Lajin
v. Radel*, 2019 WL 3388363, at *3 (S.D. Cal. July 26, 2019) (same); *Zhang v. Wolf*, 2020 WL
5878255, at *5 (E.D.N.Y. Sept. 30, 2020) (same); *Liu v. Wolf*, 2020 WL 2836426, at *8
(S.D.N.Y. May 30, 2020) (same); *Xu v. Cissna*, 434 F. Supp. 3d 43, 53 (S.D.N.Y. 2020) (same);

---

[3] The Court observes that it arrived at different percentage values when calculating the
percentage of pending cases and the increase in the Government's backlog, but the difference in
value does not change the result here.

*Dawod v. Garland*, 2023 WL 8168832, at *4 (C.D. Cal. Oct. 12, 2023) (same).  Other than arguing about LIFO's efficacy and hypothesizing about its future consequences, Arabzada does not offer arguments to dispute that the Government has offered a rationale for its actions and that the Government is following the policy it has put in place.  *See generally* Opp'n.

Accordingly, the Court joins other jurisdictions that have held that the Government's LIFO policy for I-589 asylum applications constitutes a rule of reason.  The Court concludes that the first *TRAC* factor weighs in favor of Defendants.

*b.  Second Factor*

The second factor—which requires the Court to examine the Government's delay in light of statutory timelines—favors Arabzada because "Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed" when processing asylum applications, and Defendants have moved slower than Congress's anticipated timeline.  *TRAC*, 750 F.2d at 80; *Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 38 (D.D.C. 2000) ("If a specific deadline for final agency action is provided by Congress, the reasonableness of the delay can be measured in relation to this deadline.").

Arabzada says that Congress has provided a timetable for I-589 asylum applications.  The INA provides that "in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed."  8 U.S.C. § 1158(d)(5)(A)(ii).  Further, "in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed."  *Id.* § 1158(d)(5)(A)(iii).  However, as the Government rushes to point out, *see* Mot. at 15, the statute permits a longer adjudication process in exceptional circumstances, *see* 8 U.S.C. §§ 1158(d)(5)(A)(ii)-(iii).  And,

14

generally speaking, "Congress has given the agencies wide discretion in the area of immigration processing." *Skalka v. Kelly*, 246 F. Supp. 3d 147, 153–54 (D.D.C. 2017). Consequently, courts sometimes refer to previous decisions on similar actions to gauge what a "reasonable" delay may look like. *See Sarlak v. Pompeo*, No. 20-cv-35, 2020 WL 3082018, at *6 (D.D.C. June 10, 2020).

Here, USCIS has exceeded the statutory timeline for adjudication of an I-589 asylum application: over three years have elapsed without Arabzada receiving an interview—let alone an adjudication of her application. *See* Compl. ¶¶ 1, 5, 19, 21, 24, 37. Defendants argue that USCIS's LIFO policy constitutes an "exceptional circumstance" because USCIS has determined it is the best way to address a significant backlog in applications as well as fraud and abuse by asylum applicants. *See* Mot. at 15–16. That may be so, "but the question posed in *TRAC* is not whether Congress has established a binding timetable; it asks only whether Congress has 'provided . . . [an] indication of the speed with which it expects the agency to proceed.'" *Uranga v. U.S. Citizenship & Immigr. Servs.*, 490 F. Supp. 3d 86, 103 (D.D.C. 2020) (quoting *TRAC*, 750 F.2d at 80). While the Government's LIFO policy may be a reasonable policy and permissible under the statute, USCIS's three-year delay on Arabzada's application exceeds Congress's envisioned timeline. *Id.* (finding that second factor favored plaintiff when statute expressed the "sense of Congress" that visa applications should be processed within 180 days, and plaintiff's application was pending for over four years). Although long delays are often expected in asylum visa adjudications, the delay here has been significantly longer than Congress intended and, accordingly, the second *TRAC* factor weighs in favor of Arabzada.

###### c.  Third and Fifth Factors

Courts analyze *TRAC* factors three and five together, looking to the possible effects a delay has had on a plaintiff's health and welfare and to the "nature and extent of the interests prejudiced by delay."  *See TRAC*, 750 F.2d at 80; *see also, e.g.*, *Mahmood v. U.S. Dep't of Homeland Sec.*, No. 21-cv-1262, 2021 WL 5998385, at *8 (D.D.C. Dec. 20, 2021).  Factors three and five slightly favor Arabzada.

Arabzada alleges that the delay of her application has severely exacerbated her post-traumatic stress symptoms, but her complaint provides no details about these symptoms.  *See* Compl. ¶ 35.  Arabzada also contends that the delay "has prohibited her from receiving the benefits that are available to asylees and refugees in the United States."  *Id.*  Defendants argue in opposition that "many others face similarly difficult circumstances as they await adjudication of their visa applications," Mot. at 17 (quoting *Geiger v. U.S. Dep't of State*, No. 22-cv-02986, 2023 WL 2733686, at *9 (D.D.C. Mar. 31, 2023)).  While some courts in this district have factored whether other applicants face similar circumstances into the *TRAC* factor three and five analysis, *see Geiger*, 2023 WL 2733686, at *4; *Palakuru*, 521 F. Supp. 3d at 53 ("While the Court does not doubt that [plaintiff] has an interest in prompt adjudication, so too do many others facing similar circumstances."), other courts in this district have contrarily concluded that arguments comparing the plaintiff to other visa applicants are "better considered under the fourth *TRAC* factor," *Chowdhury v. Blinken*, No. 21-cv-1205, 2022 WL 136795, at *4 (D.D.C. Jan. 14, 2022); *Varghese v. Blinken*, No. 21-cv-2597, 2022 WL 3016741, at *7 (D.D.C. July 29, 2022) (comparison "considerations are accounted for in other parts of the [*TRAC*] analysis—either in other *TRAC* factors or as part of the Court's ultimate balancing").  The Court ultimately concludes here that, taking Arabzada's allegations as true, Arabzada's allegations about her

PTSD are sufficient to tilt the third and fifth *TRAC* factors *slightly* in her favor.  *See Pourabdollah v. Blinken*, No. 23-cv-1603, 2024 WL 474523, at *8 (D.D.C. Feb. 7, 2024) (finding that third and fifth factors "slightly favor[ed]" group of plaintiffs who claimed, among other issues, that they suffered "stress[ ] and anxiety" due to their visa delay).

### d.  Fourth Factor

The fourth *TRAC* factor concerns the "effect of expediting delayed action on agency activities of a higher or competing priority."  *TRAC*, 750 F.2d at 80.  This factor is so important that the D.C. Circuit has "refused to grant relief, even though all the other factors considered in *TRAC* favored it, where a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain."  *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100 (cleaned up); *see also Tate v. Pompeo*, 513 F. Supp. 3d 132, 150 (D.D.C. 2021) ("Relief that would simply 'reorder' a queue of applicants seeking adjudication is generally viewed as inappropriate when 'no net gain' in such adjudications is achieved." (citing *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991))); *see Didban v. Pompeo*, 435 F. Supp. 3d 168, 176 (D.D.C. 2020) (noting that reordering applications "would impermissibly interfere with the agency's 'unique' and 'authoritative position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way'" (internal alterations omitted) (quoting *In re Barr Lab'ys*, 930 F.2d at 76)).

When Arabzada filed her complaint, her I-589 petition had been pending for a little over two years.  *See* Compl. ¶ 16.  Arabzada's complaint, however, does not acknowledge that ordering the Government to adjudicate her petition would simply "reshuffle the queue to put h[er] first."  *See Telles v. Mayorkas*, No. 21-cv-395, 2022 WL 2713349, at *4 (D.D.C. July 13, 2022) (internal quotations omitted); *accord Punt*, 2023 WL 157320, at *4.   Indeed, Arabzada

"does not allege that USCIS treated h[er] differently from anyone else similarly situated." *See Punt*, 2023 WL 157320, at *4. If this Court were to grant Arabzada the relief she requests, it would "necessarily come 'at the expense of other similarly situated applicants.'" *Da Costa*, 80 F.4th at 344 (quoting *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 192 (D.C. Cir. 2016)). The fourth factor, therefore, heavily favors Defendants.

The Court acknowledges Arabzada's argument that because USCIS utilizes a LIFO approach when adjudicating asylum visa applications, the line that Arabzada is "waiting in, is being jumped every day with every new application that USCIS does not interview or adjudicate." Opp'n at 6. While it is concerning that USCIS's approach could keep Arabzada and others in a similar situation waiting in perpetuity, this does not undermine the fact that granting Arabzada's requested relief would simply reshuffle the deck of applicants at the expense of other asylum applicants. Because Arabzada "seek[s] individual, not systemic, relief," *Da Costa*, 80 F.4th at 344, ordering an interview and adjudication would only help her at the expense of another applicant who is currently in a similar spot in line. And, as explained above, granting relief is inappropriate where such relief would not "do anything more than expedite [a plaintiff's] case at the expense of similarly waiting applicants." *Mahmood*, 2021 WL 5998385, at *8. While the overall impact of granting relief in Arabzada's individual case "would be minimal, an accumulation of such individual cases being pushed by judicial fiat to the front of the line would erode the ability of agencies to determine their priorities." *Tate*, 513 F. Supp. 3d at 150. Here, Arabzada has not pleaded any facts showing that granting her requested relief would result in a "net gain" beyond bringing her application to the front of the line. Accordingly, the Court concludes that the fourth factor "weighs heavily in favor of Defendants."

*Albrecht v. Blinken*, No. 22-cv-1318, 2023 WL 4488282, at *4 (D.D.C. June 16, 2023), *aff'd*,

No. 23-5157, 2024 WL 85917 (D.C. Cir. Jan. 8, 2024).

*e. Sixth Factor*

The sixth *TRAC* factor requires the Court to assess any allegations of bad faith or

unfairness on the part of the agency.  *See, e.g., Sarlak*, 2020 WL 3082018, at *6; *Zaman*, 2021

WL 5356284, at *8; *Arab v. Blinken*, 600 F. Supp. 3d 59, 72 (D.D.C. 2022).  Where a plaintiff

does not allege bad faith, the sixth factor reminds the Court not to impute impropriety to agency

delay.  *See TRAC*, 750 F.2d at 80.  Arabzada does not allege disparate treatment, bad faith, or

unfairness, and the sixth factor does not weigh in her favor.  *See Arab*, 600 F. Supp. 3d at 72;

*Zaman*, 2021 WL 5356284, at *8.  While some courts have concluded that the absence of

allegations of impropriety supports the agency, other courts have found a lack of such allegations

makes the final factor "inapplicable."  *Compare Tate*, 513 F. Supp. 3d at 150 (finding that the

absence of unfairness allegations tilts the sixth factor in favor of the agency), *with Didban*, 435

F. Supp. 3d at 177 (finding the sixth factor to be "inapplicable because Plaintiffs make no

allegations regarding the Government's motivations"); *Punt*, 2023 WL 157320, at *5 (where

plaintiff did not allege "specific facts sufficient to permit a reasonable inference of bad faith," the

sixth factor "does not alter the Court's analysis one way or the other" (cleaned up)).  The Court

need not resolve whether the sixth factor favors the Government or is inapplicable because,

either way, the Government comes out ahead.  *Zaman*, 2021 WL 5356284, at *8 (stating that

because "the sixth factor would not weigh heavily in the analysis in either event," the court need

not determine if a lack of allegations of agency impropriety weighs against the plaintiffs).

\* \* \*

Taken together, the Court's review of the six *TRAC* factors—and especially factors one and four—leads it to conclude that Arabzada has not stated a claim for unreasonable delay. While some factors modestly favor Arabzada, they are outweighed by the Government's reason for processing asylum claims in the manner that it does and the absence of any justification for prioritizing Arabzada's application over the applications of other asylum applicants.  The Court does not take lightly the difficulties Arabzada has faced from the delayed adjudication of her I-589 asylum application; all told, Arabzada has now waited over three years since filing her petition.  Nevertheless, even the "troubling backlog of petitions" and the "increasingly sluggish pace of adjudication" are not sufficient to justify judicial relief in this case.  *Da Costa*, 80 F.4th at 344.  Accordingly, the Court grants Defendants' motion.

### C.  Arbitrary and Capricious and Constitutional Claims

Arabzada also alleges that "the Defendants' unreasonable delay is arbitrary and capricious [under the APA] and an unconstitutional violation of [her] right to due process under the Fifth Amendment."  Compl. ¶ 38.  Both arguments are unpersuasive.

#### 1.  Arbitrary and Capricious Claim

With respect to her arbitrary and capricious claim, Arabzada has not identified a final agency action that can be challenged as arbitrary and capricious under 5 U.S.C. § 706(2)(A). The "Court's authority to review the conduct of an administrative agency is limited to cases challenging 'final agency action.'"  *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (quoting 5 U.S.C. § 704).  "Final agency action 'mark[s] the consummation of the agency's decisionmaking process' and is 'one by which rights or obligations have been determined, or from which legal consequences will flow.'"  *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).  To state a claim, Arabzada must point to final

agency action.  *See id.*  Arabzada has not done so.  *See generally* Compl.  Rather, she points to

the lack of final agency action, which essentially overlaps with her unreasonable delay claim.

*See*, *e.g.*, *Tate*, 513 F. Supp. 3d at 148 n.8 ("Plaintiffs' challenges to the prioritization of visa

processing . . . are best viewed through the lens of unreasonable delay.").  Accordingly,

Arabzada has failed to state an "arbitrary and capricious" claim under 5 U.S.C. § 706(2).  *See*

*Ramirez v. Blinken*, 594 F. Supp. 3d 76, 86, 89 (D.D.C. 2022) (granting in part government's

motion to dismiss visa case where plaintiffs "identified no final agency action amenable to such

an APA claim").

### 2.  Due Process Claim

Arabzada's Fifth Amendment due process claim also fails.  To succeed on a procedural

due process claim, "a plaintiff must [first] show that there was a cognizable liberty or property

interest at stake."  *Smirnov v. Clinton*, 806 F. Supp. 2d 1, 12 (D.D.C. 2011) (citing *Mathews v.*

*Eldridge*, 424 U.S. 319, 332 (1976)).  Then, "[i]f a cognizable liberty or property interest is at

stake, due process requires only 'a meaningful opportunity to present' a case."  *Hamal v. U.S.*

*Dep't of Homeland Sec.*, No. 19-cv-2534, 2020 WL 2934954, at *4 (D.D.C. June 3, 2020)

(quoting *Mathews*, 424 U.S. at 349).  In other words, a plaintiff must show that "the procedures

the government provided were constitutionally inadequate."  *Ghadami v. U.S. Dep't of*

*Homeland Sec.*, No. 19-cv-397, 2020 WL 1308376, at *10 (D.D.C. March 19, 2020) (citing

*Swarthout v. Cooke*, 562 US. 216, 219 (2011) (per curiam)); *Garcia-Villeda v. Mukasey*, 531

F.3d 141, 149 (2d Cir. 2008) ("Parties claiming denial of due process in immigration cases must,

in order to prevail, 'allege some cognizable prejudice fairly attributable to the challenged

process.'"  (citation omitted)).

Arabzada cannot meet the first requirement because "[t]here is no constitutional right to political asylum itself." *Maldonado-Perez v. I.N.S.*, 865 F.2d 328, 332 (D.C. Cir. 1989); *see also Hamal*, 2020 WL 2934954, at *4 n.4 ("Generally, there is no property right in an immigrant visa."). Indeed, the plain language of 8 U.S.C. § 1158(d)(7) expressly disclaims any substantive or procedural rights under the statute. *See* 8 U.S.C. § 1158(d)(7) ("Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.").

Moreover, even if Arabzada had a cognizable liberty or property interest, the procedures in place here are sufficient. In the asylum context, there are only "minimal procedural due process" protections and all that is required is an eventual opportunity for a "meaningful or fair evidentiary hearing with a reasonable opportunity to be present" before the Government decides the outcome of the application. *Maldonado-Perez*, 865 F.2d at 333. Arabzada will have an opportunity for a hearing when the Government schedules her interview. And courts have held that "the government's delay in scheduling or conducting immigration proceedings does not violate due process." *Vang v. Gonzales*, 237 F. App'x 24, 31 (6th Cir. 2007); *see also Mudric v. Att'y Gen. of the U.S.*, 469 F.3d 94, 99 (3d Cir. 2006) ("[F]ederal immigration laws do not vest in aliens a constitutional right to have their immigration matters adjudicated in the most expeditious manner possible."); *Garrido v. Att'y Gen. of U.S.*, 391 F. App'x 220, 222 (3d Cir. 2010) (noncitizens "do not have a due process right to prompt adjudication of asylum applications"); *Lixandru v. U.S. Att'y Gen.*, 359 F. App'x 102, 108 (11th Cir. 2009) ("In the absence of a cognizable due process right to have his asylum application adjudicated in a timely manner, [petitioner's] due process claim must fail.").

Considering that "[t]here is no constitutional right to political asylum itself,"

*Maldonado-Perez*, 865 F.2d at 332, and Arabzada will eventually have a chance for a hearing

before the Government adjudicates her application, Arabzada has not pleaded any facts that

plausibly demonstrate a cognizable liberty or property interest is at stake or that the procedures

here are inadequate.  Arabzada, therefore, cannot state a Fifth Amendment Due Process claim.

### V.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 8) is **GRANTED**.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 19, 2024                                    RUDOLPH CONTRERAS
                                                         United States District Judge